We are now ready for our first case of this morning, which is Long v. Butler, and we'll hear from you first, Ms. Cooey. Chief Judge Wood, and may it please the Court, my name is Kathryn Cooey, and I represent the petitioner Paysun Long in this matter. The prosecution in Mr. Long's case engaged in a pattern of harmful and prejudicial conduct that violated Mr. Long's due process rights to a fair trial. After Mr. Long's first conviction was overturned based upon improper comments the prosecution made during closing arguments, the prosecution again made almost identical comments during closing arguments in Mr. Long's second trial. More egregiously, however, during Mr. Long's second trial, the prosecution failed to correct the non-perjure testimony of one of its key state witnesses, Brooklyn Irby, when she repeatedly denied ever recanting her identification of Mr. Long. So just to be clear, that's the perjury we're talking about. We're not talking about whether Ms. Irby's account of who the shooter was changed. We're talking about the misrepresentation about the recantation. Exactly, Your Honor. Both parties admit that the prosecution knew that Ms. Irby had previously recanted, and therefore her testimony otherwise at Mr. Long's second trial was false. So is it important that the defense did know this fact? And in fact, by the time Mr. Walter testified, the fact of the perjury was out in open court? I have two responses to that, Your Honor. First of all, here, defense counsel knew about it, but defense counsel's efforts to expose the woman perjury were thwarted by the state's witness. So Respondent South, in its opening brief before this court, recognized that Irby continued to perjure herself when defense counsel tried to expose her perjury. So this is not one of the cases where defense counsel knew about a perjury and then just sat on it. Defense counsel was trying to expose her perjury. The perjury is what? Not the fact that she denied her recantation, is it? Or that she changed her mind and said? It is that she denied her recantation, and this is central to her credibility as a witness. The fact that she had testified. Suppose someone recants. Suppose someone initially identifies defendant as criminal and then recants her identification. Is that perjury? Not the mere fact that there's a recantation of the perjury. The fact that she denied ever recanting is the perjury here. The jury probably found it very compelling that Ms. Irby had told the same consistent story. Indeed, during the second trial, she said she hadn't changed her story at all. And this is in stark contrast to the other witnesses offered by the state who told contradictory stories and admitted to telling contradictory stories. So the fact that Ms. Irby denied ever recanting her identification may have made her testimony, and likely made her testimony, significantly more. Is there any doubt that she did recant? There is no doubt that she recanted, Your Honor, and the state has conceded as much. When the prosecutor cross-examined Investigator Walter, he seemed to acknowledge in the phrasing of his questions that Irby had previously recanted and had therefore lied on the stand in the second trial. Explain, why were those questions not sufficient to function as, shall we say, as a correction of the perjured testimony? I have two responses to that, Your Honor. To begin, the jury was instructed not to take the comments of counsel as evidence unless instructed otherwise. They were given this instruction at the beginning of trial, and the court never instructed the jury that the prosecutor's questioning there should in any way imply that the prosecution was recognizing a fact that the jury should take as a fact. My second response is that the prosecution in closing arguments implied that Ms. Irby was telling the truth. Although the prosecution mentioned the possibility that Ms. Irby may have recanted, the prosecution said when she was under oath, she came in here and she told you what she saw, and she told the truth. And that undermined the fact that Ms. Irby had committed perjury and implied that Ms. Irby took her oath seriously, when in fact in Ms. Irby's first trial she testified under oath initially that she did not see Mr. Long commit the murder and then changed her story under oath. So the prosecution knew that Ms. Irby was willing to lie about the fact that she identified Mr. Long under oath. And your argument, of course, I take it, is that the prosecutor knew that Irby had just perjured herself under oath in the second trial, and that that would violate NAPU. Exactly, Your Honor, and that fact has been recognized by the respondent in this appeal. That was also the conclusion of the Illinois Appellate Court, which actually found that the prosecution violated its obligation by not exposing the perjury itself or making any efforts to expose the perjury, a fact that the respondent has also admitted to. The prosecution made no efforts to correct Ms. Irby's perjured testimony. That is undisputed in this case. Have you conducted any research on why people recant? I have not, Your Honor. There is general research out there about recantations. That has not come up in the briefing before this court, but it's surely a fact that the jury would take into account. If a witness maintains a straight story and never deviates from that story, that's more compelling than a witness who every time discusses the event. I'm asking about this research. It must be very common for people to make an identification and then decide, look, I don't want to be dragged into this. You know, this fellow lawyer, your client has a terrible criminal record, and she might be afraid that having initially identified him as the murderer, she's now going to be at risk because of his pals. Well, Your Honor, here she was identifying him in court, so there was no apparent fear that she had in identifying him. She was identifying him. The problem here is that she denied ever recanting. The prosecution would have been free to explain the recantation or offer hypothetical reasons for it or ask her why herself, but she denied that. And when the prosecution had the opportunity. Yeah, and then the prosecution in the rebuttal speculated as to why it happened, right, because there was no basis in the record for the reasoning that the prosecution gave in closing argument. Exactly, Your Honor. The prosecution didn't even inquire into it during redirect. The prosecution did not ask one question about the recantation, did not give the witness a chance to explain maybe why she had recanted. She just waited until closing argument and then offered hypothetical reasons and implied, in fact, that maybe the witnesses in this case were threatened. That's another comment that we are arguing. It was an improper comment by the prosecution in this case. And so when do you think the prosecution should have brought the perjury to the attention of the jury? When it happened? Should there have been some kind of stipulation? Should there have been an instruction by the court to the jury at some point, maybe at the conclusion that this was a recantation that she had lied? What Napoo makes clear is that the perjury testimony has to be corrected. If counsel or prosecution had redirected the witness and the witness said from her own mouth, I did recant, and the jury heard that from her own mouth, then that would have corrected the perjury. And if the witness denied at the time, even under the prosecution's questioning, what do you think the next step would have been? The prosecution try to get a stipulation or to say to the court, we know this isn't true or I'm just trying to play out various scenarios. Those are other possibilities, Your Honor. It's not clear what exactly is required to correct perjury testimony. What is clearly established is that the perjury testimony must be corrected. Well, that rule of counsel has to be understood in the context of Napoo itself and its predecessors and its successors. And in all of the Supreme Court's cases, the perjury was unknown to the defense  And that's just not what we have here. The perjury was known to the defense. It was exposed by the defense and also ultimately exposed by the prosecution in the prosecutor's cross-examination of the investigator. So the jury did not deliberate in ignorance of this perjury. The jury did not deliberate in ignorance about the possibility of a perjury. That was conflicting testimony.  Counsel, that then leads to the question, where did the Supreme Court clearly establish that if both the defense and the jury ultimately know the truth, the prosecutor still has some remaining duty? The 2254D says that on collateral review, we can enforce only those rules that the Supreme Court has clearly established. So I'm looking for what case you believe clearly establishes this rule. I think Napoo itself clearly establishes it, Your Honor. No, in that case, the jury retired and deliberated in ignorance. And that was true in Giglio. It was true in Napoo's predecessors. So there has to be some other case, and I wonder what other case that is. We would say it was under Napoo, but you would have to look at it as applied to the facts of this case. Let me just be sure I understand. You are not saying there is any other case. In your view, Napoo itself clearly establishes that if the jury deliberates knowing the truth, it is still a violation of the Constitution because it wasn't the prosecutor who brought the truth to the jury's attention, but it was the defense who brought the truth to the jury's attention. Your Honor, we wouldn't say that the defense brought the truth to the jury's attention. The defense exposed the possibility that there was perjury by offering contradictory evidence, but contradicting can't be the same as correcting. In any criminal case, the defense is going to offer testimony that contradicts. I take it your answer to my next question, which is what case establishes that the prosecutor must correct a lie elicited by the defense would be knocked away again, even though in that case the lie was elicited by the prosecutor? It would, Your Honor. Respondent's characterization of Napoo in the supplemental briefing is that Napoo states that due process is violated when the state, although not soliciting false evidence, allows it to go uncorrected when it appears, and there is a reasonable likelihood that the false testimony affected the judgment of the jury. That's Respondent's own characterization of the rule in Napoo, and that is precisely what happened here. Indeed, the Illinois Appellate Court itself concluded that Mr. Long satisfied the first two elements of the Napoo violation, that the prosecution knowingly used perjured testimony. The only issue that the Illinois Appellate Court found against Mr. Long was that this knowing use of perjured testimony, this admitted Napoo violation, that there was no reasonable likelihood that this known violation affected the judgment of the jury. And it is that conclusion of the Illinois Appellate Court that constitutes an objectively unreasonable application of clearly established law. But I guess I have a similar question to Judge Easterbrook's in that if you get to that third point, and I'm just wondering to what extent you're trying to push the Panetti rule here, because surely it must have something to do with prejudice if the jury either does or does not know that there's at least a possibility that the witness was lying. I understand your point that just putting in impeaching evidence still leaves it up to the jury to decide who's telling the truth, the witness with the impeachment evidence or the original witness. But nonetheless, it's quite a different situation than one where the jury's absolutely ignorant. It might be slightly different here, Your Honor, and that's true because the jury had some basis for questioning the witness's testimony. In Napoo v. Illinois, though, the Supreme Court also found that giving alternative reasons to question the witness's testimony is not enough to cure the Napoo violation. It's not enough to expose and conclusively tell the jury that this testimony from this witness was, in fact, false. And that here, the jury, I mean, they had some reason to maybe doubt Brooklyn Irby's testimony, but they may have had any number of reasons for discrediting Investigator Walter's testimony. Perhaps the fact that Ms. Irby repeated it over and over again approximately 10 times, but she had never changed her story or recanted her story, conveyed a confidence that maybe it was lacking in Investigator Walter's testimony. There's no way we can tell, looking back at the cold record, what was in the minds of the jury and what they were crediting. Are you saying the jury wasn't aware of the perjury? Exactly, Your Honor. They were aware, but there was a possibility of a perjury because there was contradictory testimony on the point, but it was never made clear to the jury. And that's what's required in Napoo. Napoo can't stand for the proposition that the prosecution can allow perjured testimony to appear in its case,  after cross-examination fails to expose the perjury, close its case-in-chief without addressing the testimony, and hold... You're just saying that, you know, in case number one, the witness perjures herself, and then later on, some witness comes along and says, it wasn't that way, it was the other way, she's lying. In case number two, the prosecution itself says, somehow says to the witness, that's not the story you told last time, is it? So she might have answered differently to the prosecutor? Exactly, Your Honor. The prosecution called this witness. There's a good chance the prosecution prepared this witness and definitely probably had a better relationship with this witness. We don't know because the prosecution didn't even try. The prosecution did get up and conduct some redirected examination, but didn't ask one question about the perjured testimony and didn't seek to correct it. Again, the prosecution closes case-in-chief without correcting the testimony. And this, we say, violates the rules set forth in NAPU. Can we explore prejudice just a little bit more? So we have Cooks and Walker, who I suppose their testimony comes in by videotape, right? They testified in court, but their identification of Mr. Long came in through videotape because... That was introduced for the truth, not just to impeach what they had said? Yes, Your Honor. Okay, and so Edwards does identify Mr. Long? She does, Your Honor, but there were inconsistencies in her testimony, and her testimony also contradicted testimony of other witnesses offered by the state in pretty significant ways. For example, Ms. Edwards testified initially that after she saw the murder, she went over and cradled the victim's head until police arrived. The first officer on the scene, however, said no one was touching the victim's head when I arrived. She then later changed her story and said, no, I actually did leave before police arrived. There were other inconsistencies in her story that did not make sense and that contradicted other of the witnesses, like Ms. Irby. Ms. Irby said that no one was cradling the victim's head. So the testimony of Ms. Edwards and Ms. Irby and the other witnesses just don't fit together. Is it correct, counsel, that at every stage when the Illinois Appellate Court got to this case, it basically acknowledged that this was not a particularly strong murder prosecution in terms of the various credibility issues that the key witnesses had, the absence of physical evidence, et cetera? Indeed, Your Honor. The court recognized that the evidence against Mr. Long was not overwhelming. The same evidence was presented at Mr. Long's first trial, and the Appellate Court actually reversed Mr. Long's first conviction, relying in large part on the lack of evidence presented against Mr. Long. Was there another suspect? There was not another suspect brought out at trial, Your Honor. There was not another suspect identified at trial. The victim, though, there's evidence indicating that the victim had a gun, and it's possible the victim was part of a gang and may have had many people who were out to get him. So just the fact that there was not another suspect in the case doesn't mean that this was the only possible person who could have committed this murder. Indeed, there was no physical evidence connecting Mr. Long to the crime other than the testimony of the four eyewitnesses who, as the dissent in the Appellate Court noted, have demonstrably contradicted themselves and one another throughout the course of the investigation. There was no other evidence connecting Mr. Long to the murder in this case. Now, at the second trial when Irby lied, the defense didn't impeach her with the transcript from the first trial, right? That's correct, Your Honor, and there may have been strategic reasons for just trying to elicit the known perjury with questioning. Defense counsel may have had concerns about letting the jury know about the first trial. We can't know about defense counsel's thoughts there, but it is clear from the persistent questioning that defense counsel was trying to elicit the truth and wasn't trying to just sit on this known perjury. Counsel, in general, what obligation as an officer of the court does defense counsel have to disclose perjury testimony? Both defense counsel and the prosecution have an obligation to try to expose the truth. We would say here that defense counsel was trying to do that. Defense counsel was asking... You just indicated reasons why they may not because of tactics. They may not have tried to use the transcript, but it's also possible that Ms. Irby would have denied the transcript or say that she hadn't seen the transcript or wasn't familiar with it for another reason. Defense counsel did bring Walters in to contradict Irby's account, correct? Exactly, Your Honor. Defense counsel was taking reasonable steps to try to correct the perjury and try to expose what he could, but ultimately defense counsel was just undermining a state witness. As I said, in any criminal case, there's going to be testimony and evidence contradicting the evidence offered by the state, but contradicting just cannot be the same as correcting. Are you saying the jury didn't know that she had recanted her identification of law? Exactly, Your Honor. They had conflicting evidence, correct? Exactly. As the Respondent notes, the jury was actually free to disregard the testimony of Investigator Walter. Although Respondent argues that the jury was also free to disregard the testimony of Brooklyn Irby, this creates a kind of credibility determination that's just typical in any defense case. It doesn't constitute exposing perjury to the jury. But the prosecutor joined with the defense attorney in examining the investigator about the recantation. So why isn't that sufficient? The prosecution called Investigator Walter and then closed this case in chief, and then defense counsel called Investigator Walter separately. I understand the chronology, but once the defense elicited the recantation through the investigator, the prosecution joined with defense counsel in verifying and confirming through the investigator that there was a recantation and never argued otherwise and, in fact, in closing argument, acknowledged the recantation. So why isn't that sufficient? Why does it have to be corrected while the witness who's just perjured herself is still on the stand? Two responses, Your Honor. Again, the jury instruction said both closing arguments and comments by the attorney are not evidence. Secondly, even the — But isn't the nature of the stipulation that this fact is proven, or at least on the issue of prejudice, the Illinois appellate court could reasonably conclude that that's sufficient to show that this could not have been prejudicial because everybody agreed there was a recantation. There was no stipulation in the case, and that would be the kind of conclusive — that might be the kind of conclusive statement that would show the jury that they're bound to conclude or recognize that this was perjury. All the jury really had was conflicting testimony. And an acknowledgment from the prosecutor that, yes, she did recant, and we're not relying on the denial of the recantation to prove our case. We would submit, Your Honor, that the prosecution, in fact,  When questioning Investigator Walter, the jury may have thought that the prosecutor was asking questions about the perjury because that's what Investigator Walter said, so the prosecutor was following up on it. In closing arguments, when the prosecutor initially brought up Ms. Irby's possible recantation, the prosecutor prefaced it by saying, Mr. Cusack's going to get up here and argue that Ms. Irby lied on the stand. That implied that there was a possibility that that wasn't true. The prosecution then went on to say that when Ms. Irby came into court, she raised her right hand and told you what she saw. And the prosecution repeated that statement in the rebuttal closing. This implied that Ms. Irby was telling the truth. In addition, in the rebuttal, didn't the prosecutor then speculate as to why her testimony changed? I mean, to me, that really ratchets it up to a different level. That's correct, Your Honor. Because it wasn't just, at first, there was no direct stipulation, like a clear stipulation, which would have made the most sense in this case. And then the prosecutor then, in rebuttal, when the defense has no opportunity to respond, speculates as to why she recanted or changed her testimony. Exactly, Your Honor, and this is the kind of statement that would lead us to say that the prosecution didn't, in fact, recognize that there was a perjury and undermine the statements of Ms. Irby. Ms. Gouy, is it your position that this record reflects there was reliance by the prosecution on the falsehood? Yes, Your Honor. And specifically, what is it that the prosecution relied on? What statement did they make that would indicate that they relied on the falsehood in obtaining this conviction? Is it this closing argument that you're speaking of, where the speculation is allegedly contained? It would be, first, Your Honor, the testimony itself, which was one of the key witnesses for the state. As I mentioned, there were significant problems with the other witnesses, and Ms. Irby's testimony at trial appeared to the jury to be the most consistent because she said she had never changed her story. And then the prosecution, in closing arguments, undermined it again by implying that Ms. Irby told the truth when she came into court and raised her right hand. And that's a kind of reliance. It doesn't have to be— So what's changing in the closing argument is the reliance that you speak of? It's both reliance on the testimony because it was presented in the prosecution's case in chief and the comments in closing arguments, Your Honor, which further enforced those perjured statements. Didn't Walter make clear that she had recanted? Walter testified that, Your Honor. That's what's critical. Then you have three witnesses who recanted right out of four. So the jury knows that, and they, you know, weigh the evidence and decide that, despite these recantations, the identification is adequate. Your Honor, is responding to Ms.— That's why I asked you about whether there's a literature or that you're familiar with the literature on recantation. How often do people recant because they realize they've lied and they're going to get in trouble and so on? And how often do they recant just because they don't want to be—they don't want to get involved? They start thinking about it. They start thinking, wait a second, I don't want to be in court. I don't want the family and friends of the defendant to be seeing me testify. I want to get out of this stuff. I apologize, Your Honor, I don't have the research on that. But, again, I would say because the prosecution made no efforts to try to redirect the witness and try to elicit the reason for the possible recantation, which would have been proper, we don't know the reason why Ms. Irby recanted. But that leaves it to the jury to speculate. It does leave it to the jury to speculate, but as a respondent— Well, it's not that. I mean, the jurors can easily put themselves in the position of someone who's witnessed a murder and now is being dragged into a court proceeding to testify about that, and the person gets cold feet. Can't the jury think about that on their own? They could think about that, but that wasn't all that the jury had to consider here. She also said that the time when she gets the cold feet is earlier. By the time she's in the courtroom, she's saying, Mr. Long did it. So there are the two possibilities of recantation. One, when you get on the stand, you say, I don't remember anything or it was somebody else. I gather there were sort of 50 or 60 people floating around this place. Or two, you get on the stand and you earlier had denied knowing anything, and now you say you do know. That's correct, Your Honor. I would say that it matters more in the situation where the witness is recanting on the stand. Here, because the witness was denying her recantation, what was relevant was the fact that she was committing perjury. You can easily see how a person gets stuck. She recants. She has initial testimony identifying the murder. Then she recants. Then, while she'd like to get out of this business, she finds that she can't get out of it. Because the government wants her testimony. The government starts to pressure her. Said you identified this guy. Now you're recanting because you're a chicken. We want you to go back and testify some more. And, Your Honor, it would have been perfect. You're put in very uncomfortable positions. It may have been an uncomfortable position, but the fact is that when she was under oath, she denied ever recanting, and that is objectively false. No, no, that's not exactly a surprise. Because in most trials, my guess is in most trials, there's perjury. Right? Well, during the first trial, she recanted on the stand. So there's no apparent reason why she would have concerns about admitting that she had recanted in the first trial but not doing so in the second trial. And as the respondent admits, I'd like to note that the respondent admits that the prosecution was free to discredit her. She may feel she's getting in trouble with the government. You know, she doesn't restore her, you know, go back to her identification. It would have been very different in this trial, though, if Ms. Irby had admitted that her story had changed. That's the whole point here. Because instead, she lied to the jury, and the prosecution never acknowledged that she lied to the jury. Exactly, Your Honor. And as I said before, defense counsel asked her in a number of different ways approximately 10 times, and she repeatedly, over and over again, denied ever recanting. I see I'm interrupted about all time, so if you have no questions at this time, I'll reserve the remainder of my time. That would be fine. Thank you. Mr. Glick. May it please the Court, counsel. My name is Michael Glick, and I'm with the Illinois Attorney General's Office on behalf of the respondent. Principles of comedy, federalism, and finality provide four distinct but interrelated reasons why this court can affirm the district court's denial of habeas relief. First, Petitioner's NAPU claim is procedurally defaulted. Second, Petitioner's NAPU claim does not rely on any clearly established Supreme Court authority which affords him relief. Third, the Illinois Appellate Court's determination on post-conviction review was not objectively unreasonable. And fourth, should Petitioner clear 2254D's re-litigation bar, Brecht v. Abramson dictates that the error was harmless. The first issue that I'd like to address, which is antecedent, is the default of the NAPU claim, which hasn't been addressed. It's significant because of the ubiquity of both ineffective assistance of counsel claims and also the assertions of affirmative defenses of default. The panel addressed that, obviously, and there's a circuit split on, as I understand the law, on whether procedural default would apply here. So maybe you could concentrate on the other reasons. I'm happy to do that and return to it if I have a chance because I do think it's important for the Court. The reason that this Court, or the supplemental briefing that this Court ordered on clearly established Supreme Court authority for the point that Petitioner raises, demonstrates that Petitioner's claim cannot prevail. There is no clearly established Supreme Court authority that places an affirmative obligation on the prosecutor to correct perjured testimony that has previously been disclosed, disclosed by the prosecution before even the first trial, revealed by the defense to the jury during the course of the trial, and acknowledged by the prosecution both in its cross-examination of that witness and in closing argument. It's the last part that worries me because, and I'll just make a brief comment, the trick is always to know how close does the Supreme Court precedent have to be. The Supreme Court has told us it doesn't have to be a carbon copy, but on the other hand, of course, it needs to be close enough that you would be able to say a state court was unreasonable in its failure to apply that. But the other thing is that, you know, on the procedural default, it really seems to me, well, I mean, I have a couple points. On the procedural default, it seems to me that Mr. Long did raise this quite well in his pro se filing. He identifies the federal case that he's looking at, and so we're not supposed to be prisoners of labels. So that's one point. And the point on the other side is on the merits of the NAPU claim. The difference between the prosecution acknowledging that there's perjury and simply the back and forth of competing witnesses seems to be quite important. And under your rule, it seems that the prosecutor could introduce all the perjured testimony they wanted and just hope that rebuttal witnesses could be found by the defense. I have two responses. First, your initial comment about the fact that the pro se litigant raised the NAPU claim clearly. The decision that we're looking at here was not a pro se pleading. It was a counsel brief filed by post-conviction counsel on appeal. And so post-conviction counsel raised two claims, one which is a statewide issue that is not before the court, and the other was ineffective assistance of counsel premised upon NAPU. So that attorney, who is from the Office of the State Appellate Defender, who is well versed in the rules of law in Illinois and procedure, knew well that had he raised a NAPU claim, it would have been twice defaulted at that point on post-conviction review. First, because Illinois law requires such claims, which are matters of record, to be objected to at the time of trial and also in post-trial motions. Second, because it wasn't raised on direct appeal. So he raised a specific claim, and this court's precedent demonstrates that you look to the pleadings, not the way the court analyzes the claim to determine whether an issue is fairly presented. It would create an absurd result here for a petitioner to have never raised the Fifth Amendment NAPU claim, which is really the basis of his seeking relief here. If he never raised that claim in state court before to allow that to be preserved, where had he presented it to the state court, it would have been found forfeited. And that is important because this Court's decisions in Lewis v. Stearns and also more recently in Carter v. Duma, which just occurred last year, demonstrate that embedding a claim within an ineffective assistance of counsel claim is insufficient to preserve that claim for review. No, and I'm not challenging that, but whether it's an embedded claim or whether enough has been done to preserve it as its own claim is not always apparent because the same discussion is going to be taking place. Except that under Murray v. Carrier, where the Supreme Court set forth a standard about addressing ineffective assistance as an excuse for otherwise unpreserved claims, it required that the claim be raised in one complete round and be proven. Here, the State Appellate Court decision that we're looking at, the P.C. Court on Peel, indicated that it was addressing the one claim presented, the ineffective assistance of appellate counsel, and rejected that claim, ultimately finding that the unpreserved claim was not worthy of review. So it found a lack of prejudice and also arguably no deficiency on counsel's part because it determined that the error that was addressed was corrected, and so there was no prejudice. So that is not a preserved claim that is entitled to review by this Court. But that much at least we can look at, and this idea that it's enough to just sort of introduce all the perjury, that NAPU allows the prosecution to introduce all the perjury it wants and just make sure that you tell the defense, by the way, we're going to use this witness who's going to perjure herself, have fun finding a rebuttal witness, is the same thing that NAPU calls for. And the argument under NAPU is that, no, the prosecutor is actually in the beginning not supposed to be using perjured testimony, and if that pops out, the prosecutor itself or him or herself has to take steps to correct it. All that is clearly established by NAPU is that a prosecutor may not elicit false testimony or allow it to go uncorrected. And that didn't occur here because the prosecution, before even the first trial, disclosed Irby's recantation. That occurred both through Walter's report. No, I understand that. I guess your view is that that's just an inoculation. Once you've disclosed it, you can use the perjured testimony. Well, that didn't occur here at all. Even if that were the case, that didn't occur here because the prosecution acknowledged the false testimony. Where did the prosecution acknowledge that Irby lied to this jury? In many instances. So in one document, 13-12 and 333, which was the final rebuttal closing argument that I think Judge Williams referenced, she thought that that ratcheted up the situation. In fact, what the prosecution did there was recommit what had occurred. She said, when Ms. Irby told you that she had lied to the police, that's when you went out to serve her with a subpoena to testify at trial. Is that right? And then Walter responded, yes. And then in addition, I'm sorry, this is the cross-examination of Walter, so this is the first indication. And then she said, and then subsequent to that, in the cross-examination of Walters, she doesn't dispute the recantation. Correct. But where does she acknowledge that Irby lied to the jury? All the jury has got at this point is conflicting evidence from Irby and Walters, right? I don't think that there's any conflicting testimony because the only evidence Between Irby and Walters? Between Irby and Walters. I'm sorry, you're right. There is evidence. That's what the jury has in terms of evidence that the judge tells them to consider. Correct. It's got lawyer's argument, but where do the lawyers, the prosecution, acknowledge that Irby lied to the jury? Instead, we get in closing, in essence, she said, I wasn't telling the police the truth earlier, but, quote, well, she came in here and raised her hand and told you what happened and you saw her testimony. And so they're telling the jury to believe what she told them in the second trial, under oath, correct? Sorry, Judge. No, what they're telling her is you believe what she told you about the identification. That's what they're saying. But it's not the comment that Judge Hamilton just read isn't limited to the identification. It is. She raised her hand and then she testified about a lot of things, including the identification, but it's not limited. It is limited. Let me go back to your most specific indication that the prosecution acknowledged to the jury that she lied to the same jury. The prosecution didn't specifically say she lied. They acknowledged that she had recanted her identification as petitioner to the shooter to Walter. They never closed the circle, right? Well, they came about as close as you could come. Why not close that circle and continue to argue that Irby is credible in the closing? Well, even this court's case law says as long as the defense is provided the opportunity to address that the false testimony is disclosed. That's not what Napui says. Napui says you've got to correct, and I'm looking for the correction. It doesn't say correct. It says you can't present or allow it to go uncorrected, and it didn't do that. It left it here as a dispute, Irby and Walters, without ever resolving that dispute the way it should have been resolved. There is no reasonable probability in the facts of this case that the jury could have been confused, that Irby lied when she said that she didn't recant that she had identified petitioner as the shooter. And I just want to interrupt and say that in Napui, which is in front of me, it does say, this is the Supreme Court writing, the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected. That's the word the court uses when it appears. So we just sort of stick to that. Would you concede that the prosecutor bolstered Irby's credibility by arguing in closing that although she may have recanted when questioned outside of court, she told the truth when she was under oath, when the prosecutor knew that she had just perjured herself under oath in the second trial? And how would that not violate Napui? I really am having difficulty. So it's not impermissible when the defense is calling into question the reliability of the state's witnesses for the state to suggest that the jury credit the witnesses because of the entirety of the information. But instead of correcting the perjure testimony, the prosecution used it to its advantage by causing the jury to believe that Irby tells the truth under oath when the prosecutor knew for a fact that Irby did not tell the truth under oath. I think you're misreading the fact that the prosecution did not tell the jury that Irby told the truth under oath. They said she lied about the recantation. Where did they say that? Not in the excerpt of the closing argument you gave us. If you look also at the separate appendix at 150, 167, and 171, those are instances where the prosecution also indicated- The prosecutor says that she told some lies to her parents when she was a child. That's a little bit different from lying to the jury under oath, right? Right. That's 167. Where else? So at 150, what they said was maybe she thought that if she told the state's attorney's office she wasn't telling the truth, she wouldn't have to testify. So I think this is an answer to a question that Judge Williams asked my opponent in her opening argument. There is record evidence to demonstrate that the only reason Irby tried to lie was because she didn't want to be present in court. She didn't want to testify. She didn't want to be dragged into this for any number of reasons, which she didn't explain. Sorry, are you talking about the record evidence being what the prosecutor said in closing? Well, I'm responding because what the court has been indicating is that the prosecution somehow in closing tried to take advantage of the false testimony, and that is plainly not true. When she came in here and was under oath, she told you what she saw. That was consistent with what Kiana told you, in essence, on and on. She told the truth to you, ladies and gentlemen. I think, again, it's important to look at the specific language there. That's what I was trying to do. I'm sorry, do you have that page there? 150, the one you were just citing. Right. What he says is, Brooklyn Irby came to the State's Attorney's Office and said on an earlier occasion prior to her testifying, and I said I wasn't telling the police the truth. Well, she came in here and raised her hand and told you what happened, and you saw her testimony. Maybe she thought if she told the State's Attorney's Office she wasn't telling the truth, she wouldn't have to testify. But when she came in here and was under oath, she told you what she saw, and that was consistent with what Kiana told you, and that was consistent with what she has told you, and that was consistent with what Sorana told you, and that was consistent with the physical evidence. Nothing about that is false. We're taking advantage of Irby's lie. So where did she testify? So specifically in her testimony, she said that she lied to the State's Attorney because she didn't want to have to testify. Is that in this? She didn't say that she lied because she wanted to testify. What she said was, I didn't want to be here. I'm here only because of subpoena. So some of that is inference drawn. There is nothing specific that she said, I lied because of that. She never acknowledged the lie. That's true. This lie was disclosed by the State before the first trial, and here the defense took the best advantage possible. There was some discussion earlier about what the defense could do about whether to stipulate and other things. Here the defense called one witness, Walter, the Chief Investigator for the State, and used him to maximum effect to demonstrate that one of the four eyewitnesses lied to the jury under oath. That was the most powerful way to do that, and it can't be said that there's a better way to have done that. There are lots of ways that counsel can be strategically effective. This was probably the best way for counsel to try to counteract the State's compelling evidence here. It's true that the State Court has said multiple times the evidence wasn't overwhelming, but also true that it was compelling. There were three other eyewitnesses, and their testimony consistent with Irby's testimony pointed to a number of things. The direction the victim was running and the direction that the petitioner was shooting, the bullets that were recovered were also consistent with that direction. The fact that remnants from another gun that the victim had on him was removed from him, three of the witnesses testified to that. It's a pretty weak case, actually. By the time the police show up, there are 50 to 60 people around there. It's a chaotic situation. Unfortunately, there's all too much gun shooting around, and I don't think we have to assume Mr. Long is a saint to wonder whether somebody else could have shot it. The other witnesses are all over the block in terms of their stories, so you've got to somehow get everybody flying in the same direction somehow. That's why it's so sensitive that if this one witness was perjuring herself on the stand about her recantation, what else is she perjuring herself on? And then I'm still trying to find in the transcript where she says she didn't want to talk to the police that night because she was afraid or she had problems. I see there's at page 130, she's asked, did you talk to any police officers that night to tell them what you said or what you had seen? She says that night, I mean answer that night question, uh-huh. She says, no, they came to talk to you later, yes. And then I'm just trying to find the rest where she explains that she was hesitant to talk to them or she didn't want to talk to them. I'm trying to find that in her direct testimony. Maybe I'm overlooking it. She specifically says that the only reason that she's there is because she is under subpoena. So that's the basis, and I will find that for you momentarily. But the fact here is that the court, the Illinois Power Court, in reviewing this claim and rejecting it for lack of prejudice, didn't resolve it on the weight of the evidence, but rather on the fact that the perjury was corrected. And there can be no doubt here. There is no reasonable doubt about whether Irby, in fact, the fact that Irby had lied was disclosed by the state, was revealed by the defense. Is it disclosed by the state? I guess this is the fine point we're trying to grapple with. Certainly there's conflicting testimony. But if the jury instructions tell the jury it's up to you to decide which witnesses to believe and which witnesses not to believe, then the possibility exists that the jury would have thought that Investigator Walter was not telling the truth. Maybe he had a faulty memory. Maybe he had all the same problems that plague human beings. So I guess that's what we're trying to get at, whether just offering a different alternative to the jury is enough of a correction, or whether there really has to be some more direct correction from whoever it was who was putting the witness on.  And that's why that use of the word go uncorrected from NAPU or NAPUI or however we're going to pronounce this seems to be significant. Well, no clearly established Supreme Court precedent has ever addressed a case where perjury had been disclosed to the defense. So there is no clearly established Supreme Court precedent on point. And because of that, because this is a general rule, the state courts are afforded broad leeway in resolving that. And the way that the state court resolved it here in finding no prejudice was certainly not objectively unreasonable. As in Musladeen where, like here, there was an argument that there was... Musladeen concerned the wearing of buttons by the victims. Now, the clearly established law was that there can't be impermissible practices by the government in court, but that didn't apply under Musladeen to spectators. And there, like here, the court had found error, but the error wasn't of constitutional import, and there was no clearly established Supreme Court precedent that provided a basis to great relief. So 2254d foreclosed relief. Similarly here, the State Appellate Court's determination of lack of prejudice, whether it's viewed as a finding that there was error that wasn't of constitutional import, or whether it was harmless error, and the state court used formulations for either characterization, there was no prejudice. And the prejudice standard for both of those is the same. Were there any other suspects? There were none. Were there people investigated? No, Your Honor. The interesting thing about this was these four witnesses, none of the hallmarks that are problematic in other cases were present here. These were not stranger identifications. The lighting was good. They all knew him. There were all these people milling around, and Long, did he have some previous relationship with the victim? Yes. Mutual enemies, belonged to different gangs or something like that? There was nothing about gangs, Your Honor, but there was motive evidence that the two, that the victim and the petitioner had been involved in a scuffle, several scuffles that escalated over time. The petitioner wanted to purchase a gun from the victim. The victim refused. The petitioner punched him. Then later, the victim retaliated, struck the petitioner with a gun, and then this incident happened and escalated. So none of these 60 onlookers came to the police or suggested to anybody that there was some other possible killer? No, Your Honor, and that's correct. There were 40 to 60 people present on the scene when the police officer arrived. There's been some discussion today about whether the police officer saw somebody cradling the victim's head, but the police officer testified that he was unable to see the victim when he first arrived because there was this huge group of people around the victim. Only later did he see that person. So Kiana Edwards, the one eyewitness whose testimony has been impeached on nothing significant and has been consistent throughout and who knew both petitioner and the victim for years, identified petitioner as the shooter, and her testimony was consistent in very important and significant respects with the other three. Was she the one who said she was cradling the victim's head? She did not say that. That was a characterization that the defense asked. What she said was she tilted his head or lifted it because he was choking, which makes sense. And she might have done that quickly. And she also said she didn't see it, right? Right. Nobody saw that. There were people knowing about she wanted to get away before the police arrived because she didn't want to be dragged into this for any number of reasons, whether it's her fear of the police, taking time off of work. Can I go back for a moment to your attempt to limit NAPOE to cases in which the perjury has not been disclosed to the defense? The problem I have with that is that its logic would seem to suggest that disclosure is enough and that it's enough to tell the defense about this perjury and basically to stand aside while the defense tries to rebut it. And it's hard for me to reconcile that with the actual text of the opinion in NAPOE. There's a couple things to consider here. First of all, while we're on 2254D, we're limited. A precondition is that there has to be clearly established law. And NAPOE only states that disclosure or allowing it to go uncorrected is all that's required. Now, in de novo review or direct appeal. Those are two very different things. They are. Corrected as opposed to just rebutted and left. Justice Stevens wrote some years ago about the difference between facts that are as clear and certain as a piece of crystal or small diamond and facts that are the trial lawyer's usual mixtures of sand and clay. And I think, at least to me, that captures pretty well the problem that we face here and that the jury faced here with conflicting evidence from Irby and Walters on the one hand versus getting an explicit concession from the state to correct this perjury by conceding that it had happened. One thing that's clear is that no Supreme Court case has found a due process violation whereas here there's been disclosure to the defense. And here the state has not tried to take advantage of it, as in other cases where there was no ability to counteract the false testimony because the defense was unaware of the falsity. Of course they knew what had happened here because they'd been given a report. They had a pre-trial, basically a dry run in the first trial, so they knew what happened. And indeed, as they did in the first trial, the defense called Walter as a witness. Here to maximum effect because here, unlike in the first trial, Irby lied and said that she hadn't recanted. And then the prosecution acknowledged that lie both in questioning Walter, saying that the same state's attorney, the first assistant from Peoria County, who prosecuted the case in both instances, was also present when Irby came to the state's attorney's office and discussed that she lied to police when she initially identified Petitioner as the shooter. And she said, and I asked you whether she had said that she had lied about that identification, and Walter said yes, and I asked you to prepare a report, or my assistant asked you to prepare a report, and he said yes. And they got that report, so there's no question that the defense was armed with the ability and the opportunity, as this case is acknowledged in Shasteen and Atkins, to counteract the falsity of this testimony. In addition, this court has found that it's possible to forfeit such a claim when the defense has knowledge of the false testimony but fails to take advantage of it. They didn't do that here. They took advantage of it in the maximum way possible by putting on the chief investigator for the state to show that one of the eyewitnesses had lied. That was the best way for them to counteract the state's compelling case. This was the same prosecutor who used the gone with the wind, we don't know nothing about birth and no babies, Ms. Scarlett, in closing, and who also brought in to her rebuttal closing the letter Irby had written that was never admitted into evidence, right? That is true, and the gone with the wind comment and the anecdote comment were procedurally barred under independent and adequate state law grounds. It can't be considered by this court. Can we consider them in thinking about prejudice? No, they can't be considered at all because the state court wasn't presented with an opportunity. That's the importance of comedy and federalism here. Comedy and federalism in 2254D are sort of twin concerns. They limit what this court can do for important reasons because it's inappropriate to contradict the state court when the state court wasn't presented with an issue and didn't have an opportunity to address it at the first instance. Had the objection been made, the court could have given an instruction, could have done any number of things to counteract that. It wasn't done. It also wasn't done on appeal, and it hasn't been done in 12 years since, and now it might be far more difficult to marshal evidence to present a case against the defendant here. While true that those statements were inappropriate, the state court found the gone with the wind comment not error at all, found that it wasn't racially motivated, and this court A stunning finding, I have to say. They've probably never watched the movie. Well, this court has found in Smith v. Farley that a superfly comment, which was also clearly racial, was not prejudicial. So while it may not be the best They said it wasn't racial, though. I mean, at least you should admit that much. Well, it may be lost on the jury in general here. Oh, I don't believe that for a minute. It may be forfeited, and you may be right about that, I certainly don't believe that. Anyway, for those reasons, the defaulted claims cannot be considered. And just quickly, since I have a couple of moments, I would like to return to the embedded claim issue, which I think is an important one. This court has indicated in multiple ways that there are multiple ways to address whether or not a claim is procedurally defaulted. There's independent and adequate bar, which is not an issue with respect to the Mappu claim. There's one complete round, which is, and if there's an opportunity to present the state court with the same legal basis, as the court has said in Momiantel v. Detella, here the Fifth Amendment claim was never presented. Only the Sixth Amendment claim was presented. If it had been presented, it would have been found to have been forfeited, as I understand the Illinois rule? Yes. And are there exceptions to that? To the forfeiture rule? Only if you can establish cause and prejudice, which here essentially was addressed by the Illinois Appellate Court on post-conviction review and found insufficient. There was no prejudice they determined. And so for that reason, this court might take this as an opportunity to clarify the intra- and inter-circuit split regarding embedded claims. And I found this part about the subpoena. This is on cross-examination, and she admits that she was served on the subpoena. But in terms of speculating as to why what was used in the rebuttal argument, there's not enough basis in the record. And in terms of where she talks about what happened when the officers came and the threat to deal with her children and everything, that's all in the cross-examination. The other bit that there is in the record, Judge, is when Walter testified, he acknowledged that the time that Irby admitted that she had lied to the police about her identification was when he went to serve her with the subpoena. So there was a reasonable inference to draw under the circumstances of this case. All right, thank you very much, Mr. Glick. Thank you. Let me take further. You have three minutes left. Thank you. Respondent brought up the fact that the respondent claims that Mr. Long defaulted on his Napui claim. But this claim was presented to the Illinois Appellate Court. Although respondent argues that the petition before the post-conviction court was not a pro se petition, it was actually drafted by Mr. Long as a pro se litigant. Although post-conviction counsel was later brought in, post-conviction counsel did not make one change to this petition. So we would ask this court to give the same kind of deference that this court usually and the Supreme Court usually gives to pro se litigants. Similarly, in Maloney Walls, it was made clear that when a petitioner presents the state court with the underlying facts and details the bases for the underlying claim, that that is sufficient to constitute fair presentment. That is exactly what Mr. Long did here. He devoted several pages of his brief to focusing on the underlying Napui claim. I'd also like to focus on the fact that the state is arguing that the state court here did actually address the merits of the Napui claim and is asking this court to give that decision deference. So it's saying both that the court did address the merits and did not address the merits. And it's just an inconsistent position that doesn't flow with Maloney Walls. Respondent also talked about the fact that all of the witnesses in this case identified Mr. Long as the shooter. The witnesses who recanted their identification said that they made up the story because that was the word on the street. But that is hardly the kind of evidence that we want juries to rely on in criminal cases where the standard of review is beyond reasonable doubt. Similarly, Respondent recited to Sheffstein the ad hocs to say that this court has considered whether the defense had an adequate opportunity to cross-examine witnesses to expose perjury. In both of those cases, this court actually found that there was no perjury in those cases. There were mere inconsistencies. And then the court noted that in those cases the jury couldn't find him guilty beyond a reasonable doubt. We're not making a sufficiency of the evidence claim here, but given the really weak evidence that was presented and as acknowledged by the Illinois Appellate Court, it is our position that there is no reasonable likelihood that you can say the perjured testimony did not affect the judgment of the jury. I see my time is up, Your Honor, but for these reasons Just a minute. Oh, sorry. It's the red light that you're looking for. Apologies. So that is precisely why we would ask this court to find that Mr. Long's due process rights were violated. Just as the Illinois Appellate Court concluded that the prosecution's failure to correct the known perjury in this case violated the rule in NAPU. What you're telling us after, what, 30 minutes? There's no question that the Supreme Court rule clearly established the facts of this case and no problem with clearly established. No problem with clearly established because this Why did we take 30 minutes to argue this case? We think it does clearly fall within the scope of NAPU, the Illinois, and for these reasons we'd ask the court to reverse the district court's decision and grant Mr. Long's petition for habeas corpus. Thank you, Your Honor. All right, thank you, and we thank you as a court for your efforts on behalf of your client in this case. I can see that you're doing this pro bono. We thank the efforts of your firm as well, and of course thank you to the state, both sides, for an excellent presentation. We will take the case under advisement.